[Crim. No. 6003. Second Dist., Div. Three. Mar. 18, 1958.]

THE PEOPLE, Respondent, v. JAMES DAVID HUNTER, Appellant.

Ward Sullivan for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of violating sections 288 and 288a of the Penal Code. In a trial by jury he was convicted on both counts. Proceedings were suspended and probation was granted. He appeals from the order denying his motion for a new trial.

Appellant contends that the testimony of the prosecutrix was inherently improbable and was insufficient as a matter of law to support the verdicts.

In October, 1956, Jo Anne, the prosecutrix, 9 years of age, lived on Graywood Street with her mother, stepfather, and two younger sisters. Defendant lived on the opposite side of that street and three houses farther down the street. He lived with his wife and 6-year-old son. On Saturday morning,

October 27, 1956, Jo Anne, her sister, another little girl, and defendant's son were playing on the front lawn at defendant's home. On that morning defendant cut the lawn.

Jo Anne testified that about noon of that Saturday defendant talked to her in the garage about going for a ride and he told her to meet him in front of a school (which was around the corner and about half a block away) ; he also said he would give her some money if she would "play nasty"; then she left her bicycle in the driveway of her home, and walked to the front of the school; defendant drove a blue automobile to the school, and she got into the automobile; he drove to a drive-in restaurant where he bought a hamburger and a malt for her; after she finished eating, he drove to a place near a ditch where there were bushes; they walked along the bank of the ditch and then got back into the automobile; then her clothes were pulled down, and he licked and rubbed her between her legs; while he was doing that he gave her some money; they got out of the automobile and went behind bushes; he told her to lick him between his legs; she did what he told her to do; he drove the automobile to a place which was about half a block from Jo Anne's home, and she got out of the automobile; at that place she saw Gary, a 9-year-old neighbor, and she talked with him about two minutes; she arrived home about 1:30 p. m. and told her mother what had happened, and she gave her mother the $1.75 which defendant had given to her; sometime after that day she went with Deputy Sheriff Wagnon, in an automobile, and she pointed out the streets and places where, according to her understanding, she had gone with defendant.

Gary, the 9-year-old neighbor, testified that he lived about four houses from Jo Anne; he did not know defendant; on October 27, 1956, about five or ten minutes before 1:30 p. m., he saw Jo Anne get out of a blue automobile about two houses from his home; she told him that she had $1.75, and she showed the money to him; he thought that the money was all silver; he did not see the driver of the automobile. On cross-examination he said he was going to have a birthday party at his home on October 27 at 1:30 p. m., and that before the party started he was riding a bicycle when he saw Jo Anne coming down the street in the automobile; after he talked to her for one or two minutes he went home; he thought it was about 1:30 p. m. when he got home, because his party friends began to arrive soon after he was at home.

The mother of Jo Anne testified that on Saturday, October

27, 1956, about noon, Jo Anne made a complaint to her about defendant; at that time Jo Anne handed $1.75 to her; she (witness) put the money in a cup and then she put the cup and money (coins) in the cupboard and kept it there until she brought it to court; she notified the sheriff on the following day (Sunday). On cross-examination she said that on Saturday afternoon (after the complaint by Jo Anne) she and her husband and their three children went to a carnival; she saw defendant and his wife at a carnival booth, where the defendant and the husband of the witness tossed coins, trying to win prizes; at that time there was a friendly atmosphere among them; at that time the husband of the witness did not know "anything."

Deputy Sheriff Wagnon testified that, in the course of investigating the case, he went with Jo Anne to places which she pointed out, including a drive-in restaurant, a levee by a river, and bushes; he had a conversation with defendant on October 30 and at that time the deputy read a report to defendant wherein it was stated that the girl had $1.75; nothing further was said about money at that time; in another conversation with defendant on November 1, defendant said that he could not have given the girl the money—that his money was in bills and he did not have any 50 cent pieces; the deputy replied that he (deputy) had not said anything about 50 cent pieces; defendant said that the deputy or another deputy had mentioned it at the other conversation, and he (defendant) assumed there would be some 50 cent pieces in $1.75; on October 30 and November 1 when defendant was asked by telephone to come to the sheriff's office, he came there in response to those requests; he was not arrested until approximately two weeks after October 27.

Defendant testified he is head of the general ledger section of the accounting division of a shipyard; he was at home during the morning of October 27, 1956, and he cut the lawn; Jo Anne, other neighbor children, and his son were playing in the yard while he was cutting the lawn; he saw Jo Anne leave and go across the street about noon; he did not have any conversation with her to the effect that he told her to meet him in front of the school and he would take her for a ride; he left his house about noon of that day, and before he left he received $2.00 in bills from his wife; he did not have any other money with him except a few cents, probably 7 cents; he went to the store of the Pep Boys in Bellflower to buy a

504

handle for the door of his car; he did not make the purchase, because the clerks were busy waiting on other customers and he lost his patience and went home; he arrived home about 12:30 p. m. and began reading the newspaper; he had lunch at home that day and remained there from approximately 12:30 p. m. to 3 p. m. when he, his wife, and son went to a carnival; he saw Jo Anne and her parents at a carnival booth where he pitched coins trying to win a prize; he spoke to her parents, and the general atmosphere there was one of friendliness; he returned home about 5 p. m.; after he returned home, Jo Anne's sister came to his home and stayed there about an hour; he did not take Jo Anne anywhere in his automobile on October 27, 1956, he did not perform any of the acts upon the body of Jo Anne, which she testified he performed; when he was asked on October 30 and November 1 to go to the sheriff's office, he went there voluntarily; when one of the officers said that he (defendant) had given the girl $1.75, he replied that he did not give her any money.

Mr. Kasczuk, called by defendant, testified that on October 27 he was setting tile in defendant's home from approximately 8 a. m. until approximately 12:30 p. m.; he (witness) was of the belief that when he left defendant's home, between 12:30 and 12:45 p. m., defendant was at home reading a paper.

Mrs. Smith, called by defendant, testified that she was a neighbor of Jo Anne and defendant; that Jo Anne's general reputation for truth is bad. Two witnesess, called by defendant, testified that defendant's general reputation for morality is excellent.

 Appellant asserts that the testimony of Jo Anne was inherently improbable for the following reasons: appellant was of good moral reputation; he was employed in a responsible position; a friendly atmosphere prevailed between appellant and Jo Anne's parents at the carnival, which was after Jo Anne had complained to her mother; Jo Anne's sister was allowed to go to defendant's home on Saturday after the carnival; on two occasions defendant voluntarily went to the sheriff's office as requested; he was not arrested until several days after the alleged incident; it is improbable that the alleged acts would have been committed in broad daylight; appellant's testimony as to his whereabouts on Saturday between 12 and 1:30 p. m. was corroborated by his wife and by the man who set tile in defendant's home; Jo Anne's reputation for truth was bad. "Testimony is not inherently

improbable unless it appears that what was related or described could not have occurred. [Citation.] 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' '' (*People* v. *Thomas,* 103 Cal.App.2d 669, 672 [229 P.2d 836].)

▌ ''Inherent improbability only exists when no reasonable person could believe the testimony.'' (*Tamble* v. *Downey,* 104 Cal.App.2d 810, 812 [232 P.2d 543].) ▌ The testimony of Jo Anne was not inherently improbable.

▌ Appellant asserts further that the evidence was insufficient as a matter of law to support the verdict as to violation of section 288a of the Penal Code. That section provides: ''Any persons participating in an act of copulating the mouth of one person with the sexual organ of another is punishable . . . .'' Appellant argues that the testimony of Jo Anne, above stated, with reference to that charge, even if believed, did not prove copulation. He cites *People* v. *Angier,* 44 Cal.App.2d 417 [112 P.2d 659], wherein it was said (p. 419) that a ''lick of the private organ, even though lewdly done (Pen. Code, § 288__), is not a copulation.'' The opinion in *People* v. *Harris,* 108 Cal.App.2d 84 [238 P.2d 158], was written by the same Justice who wrote *People* v. *Angier, supra.* In *People* v. *Harris* it was said at page 88: ''He [appellant] seeks refuge behind *People* v. *Angier.* . . . This court [in the Angier case] was impressed that the mouth of the accused could not have touched the bodies of the children. . . . On reaching that conclusion we were led into a discussion of the significance of the word 'copulate.' While that discourse was philologically correct it was calculated to lead to the erroneous doctrine that the use of the word in section 288a signifies a legislative intent that an offender of the statute is guilty only when he has committed the repulsive act of sex perversion. Such was not the purpose of the lawmakers or the intention of this court. A person is guilty of violating the statute when he has placed his mouth upon the genital organ of another. . . . The Angier decision is not pertinent unless the factual situation under judicial consideration is in all essential details identical with those there adjudicated.'' In the present case, the evidence was legally sufficient to support the verdict as to violation of section 288a.

Whether or not the testimony of Jo Anne and other prose-

cution witnesses should be believed was a question for the determination of the jury. That testimony, if believed, was sufficient to support the verdicts.

The order denying the motion for a new trial is affirmed.

Vallée, J., concurred.

Shinn, P. J., concurred in the judgment.