Filed 9/19/13  P. v. Lee CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>ROBERT CHARLES LEE,<br><br>  Defendant and Appellant. | B240618<br><br>(Los Angeles County<br>Super. Ct. No. YA065284) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Larry P. Fidler, Judge.  Affirmed as modified.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Kenneth C. Byrne and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Robert Charles Lee (appellant) was convicted by jury of 35 counts in connection with attacks on 10 women over a period of nearly nine years. He was sentenced to multiple life terms and a separate aggregate determinate term in state prison. On appeal, he claims the trial court erred in imposing multiple consecutive indeterminate terms of 25 years to life in violation of the Penal Code section 667.61[1] prohibition against consecutive sentences for multiple sexual offenses committed against the same victim on a single occasion. He also contends his constitutional rights under the Sixth Amendment to the United States Constitution were violated by his inability to confront and cross-examine witnesses who performed genetic testing, and that the evidence on certain counts was legally insufficient to sustain conviction.

We agree that the trial court's imposition of a life sentence for each pre-September 20, 2006 sexual offense committed by appellant against the same victim on a single occasion was unauthorized. We reject appellant's other contentions. We use our discretion to modify the judgment and otherwise affirm.

**PROCEDURAL AND FACTUAL BACKGROUND**

**1.      Procedural**

Appellant was convicted of the following offenses: (1) Q. M.—forcible oral copulation and forcible rape (§§ 288a, subd. (c)(2) & 261, subd. (a)(2)) (counts 1 and 3); (2) Dorothy M.—forcible rape and first degree burglary (§§ 261, subd. (a)(2) & 459) (counts 9 and 12); (3) Rose B.—forcible sodomy, forcible rape, two counts of forcible sexual penetration, two counts of forcible oral copulation, and first degree burglary (§§ 286, subd. (c)(2), 261, subd. (a)(2), 289, subd. (a)(1), 288a, subd. (c)(2) & 459) (counts 13–18, and 20); (4) Claudia C.—two counts of forcible oral copulation (§ 288a, subd. (c)(2)) (counts 22 and 23); (5) Toni F.—four counts of forcible oral copulation, three counts of forcible rape, and forcible sexual penetration (§§ 288a, subd. (c)(2), 261, subd. (a)(2), & 289, subd. (a)(1)) (counts 25, 26, 28, 30, and 32–35); (6) J. S.—two counts of

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

forcible oral copulation, forcible rape, and first degree burglary (§§ 288a, subd. (c)(2), 261, subd. (a)(2) & 459) (counts 38, 39, 41, and 44); (7) Helen C.—forcible rape and first degree burglary (§§ 261, subd. (a)(2) & 459) (counts 45 and 48); (8) Kathy S.—assault with intent to commit a felony and first degree burglary (§§ 220 & 459) (counts 49–50); (9) Janice C.—forcible sexual penetration, forcible oral copulation, and first degree burglary (§§ 289, subd. (a)(1), 288a, subd. (c)(2) & 459) (counts 51–53); and (10) Lisa L.—forcible rape, forcible sodomy, and forcible oral copulation (§§ 261, subd. (a)(2), 286, subd. (c)(2) & 288a, subd. (c)(2)) (counts 54–56).

The jury also found to be true the following allegations: (1) that appellant committed the offenses during a first degree residential burglary within the meaning of section 667.61, subdivisions (a) and (d) (counts 1, 3, 9, 13–18, 22–23, 25–26, 28, 30, 32–35, 38–39, 41, 45, 51–52, and 54–56); (2) appellant personally used a deadly or dangerous weapon and committed sexual offenses against more than one victim within the meaning of section 667.61, subdivisions (a) and (e) (counts 1, 3, 22–23, 38–39, and 41); (3) appellant personally used a deadly or dangerous weapon within the meaning of section 667.61, subdivisions (b) and (e) (counts 9, 13–18, 25–26, 28, 30, 32–35, 45, 51–52, and 54–56); (4) appellant committed sexual offenses against more than one victim within the meaning of section 667.61, subdivisions (b) and (e) (counts 9, and 54–56); (5) appellant committed the offenses during a burglary within the meaning of section 667.61, subdivisions (b) and (e) (counts 54–56); (5) appellant used a knife within the meaning of section 12022.3, subdivision (a) (counts 1, 3, and 22–23); and (6) appellant used a screwdriver within the meaning of section 12022.3, subdivision (a) (counts 38–39, 41, and 44).

Appellant admitted one prior serious felony conviction (§ 667, subd. (a)(1)) and one prior conviction (strike) within the meaning of California's "Three Strikes" law. (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i).)

Appellant was sentenced to a term of 750 years to life plus 14 years and eight months in state prison, calculated as follows: on count 49, a principal term of 12 years

(upper term of six years, doubled pursuant to the Three Strikes law); on count 50, a consecutive subordinate term of two years and eight months (one-third the midterm of four years, doubled); 26 indeterminate terms of 25 years to life to run consecutively to each other after service of the aggregate determinate term on counts 1, 3, 9, 13–18, 22–23, 25–26, 28, 30, 32–35, 38–39, 41, 45, and 54–56; and, two consecutive terms of 50 years to life (25 years to life doubled pursuant to the Three Strikes law) on counts 51 and 52. The court imposed and stayed sentences on counts 12, 20, 44, 48, and 53, pursuant to section 654. Appellant was awarded 2,444 days of presentence credit consisting of 2,126 days of actual custody credit and 318 days of conduct credit.

## 2. Prosecution evidence[2]

### a. *Toni F.* (*counts 25, 26, 28, 30, and 32–35*)

On April 11, 2001, at approximately 2:25 a.m., Toni F. was asleep alone in her home when she heard a noise and awoke to find the shadowy figure of a man leaning over her. Appellant pushed her back down on the bed and pulled her clothes off. Appellant put his mouth on her vagina and then put his penis in her mouth. He then put his penis in her vagina and fondled and sucked her breasts. He put his mouth on her vagina a second time and proceeded to put his penis in her vagina again. Appellant wore black clothing, including a black sweater, ski mask, and gloves. He called Toni F. "little esse" and told her not to call the police.

On August 1, 2001, at approximately 3:50 a.m., Toni F. was watching television in her home when she was attacked by appellant. Appellant put his penis in Toni F.'s mouth and ejaculated. He inserted his fingers in her vagina, put his mouth on her vagina, and then raped her. He used the same Spanish phrase Toni F. heard during the previous attack. Appellant left when Toni F.'s neighbor came to check on her. Toni F. called the

---

[2]  The facts herein contain a description of the crimes and details that relate to appellant's contentions on appeal, therefore, we omit a summary of the facts relating to victims Rose B., Claudia C., J. S., Kathy S., and Lisa L., as they are not relevant. Likewise, appellant is not contesting any issues related to the collection of DNA evidence or its chain of custody and those underlying facts are also omitted.

police and told them she had been attacked by the same man that raped her on April 11, 2001.[3]

A male DNA profile was developed from a swab of Toni F.'s right breast obtained on April 11, 2001. A DNA saliva reference sample was obtained from appellant following his arrest in connection with a residential burglary on October 5, 2005. A DNA profile was developed from appellant's saliva reference. The two profiles matched with a random match probability of one in 10 quadrillion. A male DNA profile developed from a swab of Toni F.'s mouth collected August 1, 2001, matched appellant's reference profile with a random match probability of one in 326 billion.

### b.     Q. M. (*counts 1 and 3*)

On April 25, 2001, Q. M. was asleep alone in her apartment. At approximately 5:00 a.m. she was awakened by appellant standing next to her bed. Appellant pressed his exposed penis against Q. M.'s face and told her to "suck it" or he would kill her. Appellant did not have an erection but kept trying to force his penis into her mouth. At some point his penis went inside Q. M.'s mouth but "it did not go inside [her] mouth completely." She tried to fight him off but appellant climbed on top of her. He positioned himself with his head near her thighs and tried to pry her legs apart with his hands. He licked her thighs and when he forced her legs apart he licked her "private area."[4]

Appellant questioned Q. M. about a house arrest bracelet she wore on her leg. He changed position so that he was now face to face with her but still holding her down. Appellant prodded Q. M. in the side with a sharp object that felt to her like either a knife, a screwdriver, or a pair of scissors. He tried to put his semi-erect penis into her vagina

---

[3]     An audio recording of the 9-1-1 call was played for the jury and admitted into evidence.

[4]     During an April 24, 2001 sexual assault examination performed on Q. M. by Jan Hare, a forensics nurse specialist, Q. M. stated that appellant licked her "inner thighs" and "vaginal area."

and was only able to penetrate the upper portion of her vaginal lips. Appellant was able to get his penis "halfway" inside Q. M.'s vagina.

Q. M. was scared of appellant and told him she would comply if he would go to the bathroom and get a condom. As appellant returned from the bathroom, a box that was attached to Q. M.'s house arrest ankle bracelet rang, and then immediately afterwards the telephone rang. She told him she had to answer it because it was the police. Appellant pulled the telephone out of the wall, asked her where she kept her money, and then left.

DNA from a swab of Q. M.'s right thigh obtained after the April 24, 2001 sexual assault matched appellant's genetic profile. The random match probability was one in 10 quadrillion.

### c. Dorothy M. (counts 9 and 12)[5]

On June 9, 2005, at approximately 3:30 a.m., Dorothy M. was asleep alone in her home when she heard her window blinds moving. She was "dumbfounded" when a few minutes later appellant got on top of her in her bed. Appellant put his hands around Dorothy M.'s throat and began to strangle her. Appellant said "I know you, Dorothy," and when she tried to talk he told her "Callate I kill you."

Appellant stood up, unzipped his pants, placed Dorothy M.'s hand on his penis, and told her to hold it. He then kissed Dorothy M.'s right breast nipple, and got on top of her. Appellant tried to have intercourse with her but she squirmed. He was able to get his penis "a little bit" into her vagina.

During the struggle, Dorothy M. suffered an injury to her right arm which was "very painful and very hot." She felt appellant "mark" her and subsequently saw a "moon shape[d]" wound to her arm. Appellant threw Dorothy M. a towel and left. The wound bled significantly on the bed before she got up to wash it. A sexual assault examination of Dorothy M. was performed by Toyetta Beukes, a registered nurse and

---

**5**  A video recording of Dorothy M.'s conditional examination taken on October 10, 2006, was played for the jury, after the trial court found she was unavailable due to illness.

forensic nurse examiner, who had specific training in identifying injuries caused by various types of weapons. Beukes testified the incised wound on Dorothy M.'s right arm was consistent with a knife or trauma from a weapon because of the fine edges of the wound.

DNA from a swab of the right breast of Dorothy M. obtained after the June 9, 2005 sexual assault, matched appellant's genetic profile. The random match probability was one in 13 quadrillion.

### d.     Helen C. (*counts 45 and 48*)

On February 27, 2006, at approximately 2:53 a.m., Helen C. was awakened by "two hands around [her] throat squeezing so tight [she] thought it was the last breath [she] was gonna take." She felt the weight of a body on top of her and heard a male voice say "If you see me, I'll kill you." Appellant asked for money and then left. Helen C. felt wet in her vaginal area and discovered her vagina was bleeding. She had not felt any penetration because she had been in shock and her body was numb.

DNA from a swab of blood obtained from Helen C.'s bedspread, after the February 27, 2006 sexual assault, matched appellant's genetic profile. The random match probability was one in one trillion.

### e.     Janice C. (*counts 51–53*)

On June 15, 2006, at approximately 3:25 a.m., Janice C. was asleep alone in her home. Her son Josh, who lived with her, was at work. She woke up to discover someone was suffocating her with a pillow. She began to scream and heard a voice say "callate, callate." She tried to push away from appellant but he pulled her towards him and put his fingers inside her vagina. She continued to scream while appellant licked her vagina. Janice C. could feel a sharp object on the side of her temple and appellant jabbed her with it while sexually assaulting her.

Josh entered the house and turned on the lights. He heard voices and the sound of a struggle. Janice C. told him to call the police. She could see appellant had long curly hair and was wearing a dark sweatshirt with a hood. In court, Janice C. testified that

appellant's eyes "absolutely" reminded her of the man who assaulted her because she could "never forget" the eyes.

Josh called the police on his cell phone. Appellant walked right up to him and paused for a second. Josh froze. He followed appellant out the door and into the parking lot, where appellant got into a black car and drove away. On July 17, 2006, Josh identified a photo of appellant from a six-pack of mug shots shown to him.

DNA from a swab of Janice C.'s vulva obtained after the June 15, 2006 sexual assault matched appellant's genetic profile. The random match probability was one in 80 million.

### 3. Defense evidence

Appellant testified in his own behalf and stated he knew some words in Spanish, including that "callate" meant "be quiet." He went out late at night, up to three times a week, to visit "different girls' houses." He was active in martial arts and often wore black pants. He bought a "ninja" outfit in 2001, but only wore it one time on Halloween. He did not have scratches on his face in 2001 but sometimes got injured while practicing martial arts.

Appellant owned a black car and sometimes used gloves to change the tires. He kept screwdrivers, a flashlight, black gloves and latex gloves, a black hooded sweatshirt, a couple of knives, and scissors in his car. Appellant admitted that he spent a few hours near Helga K.'s mobile home on October 5, 2005 and tried to break into it while wearing a black hooded sweatshirt.[6] He denied putting his DNA on any of the victims and stated it was not his DNA.

Dr. Laurence Mueller, a professor at the University of California at Irvine, testified for the defense as a DNA expert. He cited studies that called into question the accuracy of statistical calculations used in DNA laboratories. He disagreed with the

---

[6] Appellant had a prior conviction for first-degree burglary in the same trailer park where Janice C. had been sexually assaulted four months earlier.

random match probability calculations of the prosecution's experts, but conceded that random match probability was appropriate to use in this case.

## DISCUSSION

### I.     Appellant's Multiple Section 667.61 Life Sentences Were in Error

Appellant contends, and the People agree, that the trial court erred in imposing a life sentence under section 667.61 for all 28 sexual assaults.  An appellate court may correct a sentence that is not authorized by law (*In re Hoddinott* (1996) 12 Cal.4th 992, 995–996, fn. 2), and the sentence the court imposed is not that required by the statute.  We will order the appropriate modification.  Remand to the trial court for sentencing is not necessary in this case as the court made abundantly clear how it would exercise its discretion.  The trial court adequately provided statements of reasons for each of its sentencing choices and stated, "It's my intention, despite the enormous amount of years, to impose every possible minute on Mr. Lee that I can."

#### A.     *Relevant Proceedings Below*

The jury found true the allegations that appellant committed 28 sexual offenses[7] in nine separate attacks which occurred before September 20, 2006.  The trial court stated its intention to sentence appellant under sections 667.61, subdivision (i), and 667.6, subdivisions (b) and (c).  The trial court provided a statement of reasons for its sentencing choices.  The court found no factors in mitigation and found the following factors in aggravation:  (i) the crimes and their objectives were predominantly independent of each other (Cal. Rules of Court, rule 4.425(a)(1)); (ii) the crimes involved separate acts of violence (Cal. Rules of Court, rule 4.425(a)(2)); (iii) the crimes involved great violence (Cal. Rules of Court, rule 4.421(a)(1)); (iv) the victims were particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); (v) the manner in which the crimes were carried out indicated planning (Cal. Rules of Court, rule 4.421(a)(8)); (vi) appellant engaged in violent conduct that indicated a serious danger to society (Cal. Rules of Court,

---

[7]     Appellant was convicted of seven additional offenses (six counts of burglary and one count of assault.)

rule 4.421(b)(1)); and (vii) appellant was on probation when the crimes were committed. The court stated its reasons for choosing "to impose the maximum sentence" were because the crimes were "so cruel and so vicious and so pathetic." The court imposed 28 One Strike sentences of 25 years to life, two of which were doubled pursuant to the Three Strikes law.

### B.     Applicable Legal Principles

California's "One Strike" law, section 667.61, provides for enhanced indeterminate terms of 15 or 25 years to life for those convicted of forcible sex offenses under certain aggravating conditions. The underlying offenses are punishable by determinate terms. (§§ 261, subd. (a)(2), 264, 286, subd. (c)(2), 288a, subd. (c)(2) & 289, subd. (a)(1).)

Former section 667.61, subdivision (g), in effect when appellant committed the instant offenses, provided, in relevant part, that an indeterminate term imposed under former section 667.61, subdivision (a) or (b) "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion. . . . Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6, if applicable." (Stats. 1998, ch. 936, § 9.)

Subdivision (a) of former section 667.61 provided: "A person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years except as provided in subdivision (j)." (Stats. 1998, ch. 936, § 9.)

Effective September 20, 2006, the Legislature amended section 667.61 to eliminate former subdivision (g). (Stats. 2006, ch. 337, § 33.) Subdivision (i) was amended to read in relevant part: "[f]or any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), the court shall impose a consecutive sentence for each

10

offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions, as defined in subdivision (d) of Section 667.6." (Stats. 2006, ch. 337, § 33, eff. Sept. 20, 2006.) Subdivision (i) was subsequently amended to also include offenses specified "in paragraphs (1) to (6), inclusive, of subdivision (n)." (Stats. 2010, ch. 219, § 16, eff. Sept. 9, 2010.)

### C. *Application of Sections 667.6, and 667.61, Subdivisions (a) and (g)*

The trial court cited to sections 667.6, and 667.61, subdivision (i) in its initial statement of reasons when sentencing appellant to the 28 indeterminate terms of 25 years to life to run consecutively to each other. The provision relevant to multiple offenses sentencing in this case is former subdivision (g).

Based on the trial court's statement of reasons, and clear intent to sentence appellant to the maximum possible sentence, and the applicable statutes in effect at the time of the crimes, appellant's sentence is calculated as follows:

#### 1. Indeterminate sentence

An indeterminate term of 25 years to life for one count subject to section 667.61, subdivision (a) for each victim.[8] The authorized indeterminate sentence for appellant is nine terms of 25 years to life (counts 1, 9, 18, 23, 30, 35, 41, 45, and 54) plus one term of 50 years to life (count 52) (25 years to life doubled, pursuant to §§ 667, subds. (b)–(i) & 1170.12, subds. (a)–(d)), for a total of 275 years.

#### 2. Determinate sentence

A consecutive upper term for each of the remaining counts for which appellant was convicted.

On count 51—a principal term of 16 years (the upper term of eight years, doubled pursuant to §§ 667, subds. (b)–(i) & 1170.12, subds. (a)–(d)); on count 49—a consecutive subordinate term of 12 years (the upper term of six years, doubled pursuant to the Three

---

[8]    In chronological order, the victims of sexual offenses were:  Claudia C., Toni F. (4/11/01), Q. M., Toni F. (8/1/01), Lisa L., Dorothy M., Rose B., J. S., Helen C., and Janice C.

Strikes law); on count 50—a consecutive subordinate term of two years eight months (one-third the midterm of four years, doubled pursuant to the Three Strikes law); on counts 3, 14, 26, 32 and 39—consecutive terms of eight years (upper term for violation of § 261, subd. (a)(2)); on counts 13 and 55—consecutive terms of eight years (upper term for violation of § 286, subd. (c)(2)); on counts 15 and 16—consecutive terms of eight years (upper term for violation of § 289, subd. (a)(1)); on counts 17, 22, 25, 28, 33, 34, 38 and 56—consecutive terms of eight years (upper term for violation of § 288a, subd. (c)(2)); for a total determinate sentence of 166 years and eight months.

The resulting modified sentence increases the determinate sentence term from 14 years and eight months to 166 years and eight months, but reduces the indeterminate term from 750 years to life to 275 years to life.[9]

## II. No Violation of Sixth Amendment's Confrontation Clause

Appellant contends that his right to confrontation under the Sixth Amendment to the United States Constitution was violated because the testifying DNA experts did not personally perform all of the testing upon which they relied in reaching their opinions. He contends the admission of the DNA evidence was prejudicial because he was not afforded an opportunity to cross-examine the witnesses who performed the preparatory testing steps. Appellant challenges the testimony of witnesses Lisa Grossweiler, Erika Jimenez, and Richard Gustilo and the admission of DNA evidence in the cases involving Toni F., Helen C., and Janice C., only. Finding no violation of the confrontation clause, we reject his contention.

### A. *Background*

#### 1. **Grossweiler–Toni F.**

Lisa Grossweiler, a DNA analyst at Orchid Cellmark Diagnostics laboratory,[10] offered the opinion that the male DNA profile developed from a swab of Toni F.'s right

---

[9]     That appellant receives a "'more severe punishment'" in its practical effect as a result of this correction, is not a bar to the imposition of a proper judgment. (*People v. Torres* (2008) 163 Cal.App.4th 1420, 1429, citing and quoting *In re Ricky H.* (1981) 30 Cal.3d 176, 191.)

breast obtained on April 11, 2001, matched the male DNA profile developed from a swab of Toni F.'s mouth collected August 1, 2001. In reaching this conclusion, Grossweiler relied on raw data and documentation her team provided on the August 1, 2001 samples. Cellmark followed standard techniques or generally accepted protocols for DNA typing. Grossweiler's team performed the preliminary steps of extraction, quantification, amplification, and typing, and she reviewed the work at each stage and verified the documentation before authorizing the next step. Grossweiler herself performed all the preliminary steps to develop the male DNA profile with respect to the Toni F. April 11, 2001 DNA sample. Both DNA profiles were developed in June 2002.

Appellant's counsel objected to Grossweiler's testimony on the grounds that it was hearsay. Appellant's counsel cited *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), and *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705, 180 L.Ed.2d 610] (*Bullcoming*). The trial court overruled the objection.

### 2. Jimenez—Toni F.

Erika Jimenez was a DNA analyst at Orchid Cellmark Diagnostics laboratory in 2006.[11] She and her team performed DNA analysis on a reference swab obtained from appellant and submitted to the laboratory by the Los Angeles Police Department. Her team members extracted, quantified, amplified, and typed the DNA profile. Jimenez reviewed all the notes in the laboratory to confirm that all protocols were followed. She then analyzed the data, generated and signed a report of the results.

Appellant's DNA profile developed by Jimenez identified 13 loci (specific physical location on a DNA strand) and was compared to the one Grossweiler developed

---

[10] At the time of trial, Grossweiler was a forensic examiner with the Federal Bureau of Investigation. We refer here to her occupation at the time the genetic testing was conducted and reviewed.

[11] At the time of trial, Jimenez was a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation.

from the August 1, 2001 Toni F. sample.  The profile created by Grossweiler identified nine loci.  All nine loci matched appellant's DNA profile.  Jimenez opined that appellant could not be excluded as the source of the DNA from the August 1, 2001 Toni F. sample.  The estimated frequency of occurrence of the nine loci genetic profile was one in 326 billion unrelated individuals.

### 3. Gustilo—Helen C. and Janice C.

Richard Gustilo was a forensic scientist for the Orange County crime laboratory.  As the case manager for the Helen C. assault, he was responsible for all phases of testing and analyzing DNA samples and confirmed that all tests assigned to other analysts were properly performed.  Gustilo himself performed a screening test on the swabs collected from Helen C. and detected sperm on two swabs.  He reviewed the notes created by his coworker, Susie Beal, who performed the extractions.  He also reviewed the notes created by another coworker, Jeanne Putinier, who created a DNA profile from the extract.  The procedures were properly performed by Gustilo's colleagues.  Gustilo interpreted the data generated from the DNA profile and prepared and signed a report of his findings dated April 6, 2006.  Gustilo compared the DNA profile he developed to a reference sample obtained from appellant.[12]  Gustilo concluded that appellant's reference sample matched the DNA profile from the Helen C. samples.  He prepared and signed a final report of his findings dated June 26, 2006.

Gustilo was also the forensic case manager for the Janice C. assault.  He screened the vulva swabs obtained from Janice C. and identified saliva.  He reviewed the notes prepared by his coworker Heidi Hunsaker, who performed the extraction and found that she followed the proper procedures and protocols.  Gustilo himself typed the extracted DNA and developed a male DNA profile.  He concluded that appellant's reference sample was "consistent" with the DNA profile obtained from the Janice C. swab.  Based

---

[12]     John Bockrath, senior criminalist with the Los Angeles County Sheriff's Department, generated a DNA profile of a reference sample obtained from appellant after his June 2006 arrest.

on his statistical calculations made to determine the frequency of a genetic profile in a random unrelated population, Gustilo testified that the probability that two people would share the same "consistent" DNA patterns was one in 80 million.

### B.  *Trial Court's Rulings on Admissibility of Testimony*

After reviewing all of the transcripts related to the forensic testimony, the trial court limited his remarks to witnesses Grossweiler, Jimenez, and Gustilo. The court noted that Grossweiler and Jimenez headed teams of DNA analysts, who performed the necessary steps that produced the data that Grossweiler and Jimenez analyzed. Grossweiler and Jimenez ensured that all proper controls were in place and reviewed the work of their subordinates before permitting the next step to take place in the DNA testing process. None of the team members testified, but Grossweiler and Jimenez testified only to what they themselves found and not the team members' findings.

The court stated that Gustilo, who was a case manager and supervisor, testified as to what other people did at the laboratory. He testified that Beal performed the Helen C. extraction and Hunsaker performed the Janice C. extraction. He reviewed their notes to ensure they followed the proper protocols but did not testify as to what either of them said. The court found that Gustilo testified to his own conclusions based on his own interpretation of the data. The trial court gave the prosecution and defense the opportunity to subpoena Beal and/or Hunsaker and arrange for their testimony, but neither party accepted the court's offer.

### C.  *Standard of Review*

The California Supreme Court has held that appellate courts should generally apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to confrontation. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 [concluding that "independent review" applies because "the ruling we are reviewing affects the constitutional right of confrontation"].) Accordingly, we apply the de novo standard of review to appellant's claim that the trial court violated his constitutional right to confrontation.

15

### D. Analysis

Appellant asks this court to conclude "that the testimony of experts who relied upon laboratory reports of non-testifying witnesses to conclude there was a DNA match to appellant's genetic profile violated the Confrontation Clause." Appellant's argument on this point is not the current state of the law. The testimony of Grossweiler, Jimenez, and Gustilo does not constitute the sort of testimonial evidence that would trigger appellant's rights under the confrontation clause.

A criminal defendant's Sixth Amendment right "[i]n all criminal prosecutions . . . to be confronted with the witnesses against him" (U.S. Const., 6th Amend.), has been implemented by the corresponding rule that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford, supra,* 541 U.S. at p. 59.)

In *Crawford*, an unconfronted statement made by the defendant's wife in response to custodial interrogation was testimonial and the defendant's right to confront witnesses against him was violated by its admission. (*Crawford, supra,* 541 U.S. at p. 68*.*) The United States Supreme Court applied its *Crawford* holding in three cases involving laboratory findings of nontestifying analysts: *Melendez-Diaz, supra,* 557 U.S. 305; *Bullcoming, supra,* 131 S.Ct. 2705; and *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89] (*Williams*).

In *Melendez-Diaz*, a chemical analyst's affidavit was admitted as a substitute for live testimony to prove an element of the drug trafficking offense—that the substance the defendant possessed was cocaine. Five justices agreed that the certification was "testimonial" because affidavits are within the core class of testimonial materials covered by the confrontation clause. (*Melendez-Diaz, supra,* 557 U.S. at p. 310.)

In *Bullcoming*, five justices agreed that a certified blood-alcohol report prepared by a nontestifying lab analyst was testimonial. (*Bullcoming, supra,* 131 S.Ct. at pp. 2709, 2718–2719.)

In *Williams*, five justices agreed that the uncertified results of a DNA analysis, performed by nontestifying Cellmark analysts, were nontestimonial. (*Williams, supra,* 132 S.Ct. at p. 2228.) Justice Thomas concurred solely because the uncertified analysis lacked the requisite formality and solemnity to be considered testimonial. (*Id.* at pp. 2255–2256, 2259–2260, conc. opn. of Thomas, J.) He reaffirmed that he would not join in any definition of "testimonial" that reaches beyond ""'formalized testimonial materials,'" such as depositions, affidavits, and prior testimony, or statements." (*Ibid.*)

The California Supreme Court addressed the significance of *Crawford*, *Melendez-Diaz*, *Bullcoming*, and *Williams* in three cases decided in 2012: *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*); *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*); and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*).

The *Lopez* court identified two "critical components" required to find a statement testimonial: 1) the statement must have been made with some degree of formality or solemnity; and 2) its primary purpose must pertain in some fashion to a criminal prosecution. (*Lopez, supra*, 55 Cal.4th at p. 581, 582.) The court concluded that a lab analyst's unsworn report analyzing machine-generated blood-alcohol concentration data lacked the requisite degree of formality to be testimonial, and the court therefore did not consider the primary purpose of the report. (*Id.* at pp. 582, 584.) In *Dungo*, using the same criteria, the court concluded that factual observations by a nontestifying pathologist about the condition of a body, recorded in an unsworn autopsy report, were not testimonial because they lacked formality and the autopsy report had other purposes aside from criminal investigation. (*Dungo, supra*, 55 Cal.4th at p. 621.) In *Rutterschmidt*, the court did not decide whether a lab analyst's report was testimonial because overwhelming evidence of guilt rendered any confrontation clause violation harmless beyond a reasonable doubt. (*Rutterschmidt, supra,* 55 Cal.4th at p. 661.)

The People argue, and we agree, that the forensic data and reports in this case relied on by the testifying DNA experts, Grossweiler, Jimenez, and Gustilo were not prepared with the requisite formality or solemnity. Nor was there any evidence of a

17

sworn certification, declaration, or other formality. They were unsworn, uncertified records of objective fact and unsworn statements that "merely record objective facts" that are not sufficiently formal to be testimonial. (*Dungo, supra,* 55 Cal.4th at p. 619.)

A factual distinction between our case and *Lopez* further supports the conclusion that the testimony of Grossweiler, Jimenez, and Gustilo was not barred by the Sixth Amendment. In *Lopez*, the defendant was charged with vehicular manslaughter while intoxicated and the prosecution introduced into evidence a chart containing handwritten notations by another analyst and a laboratory assistant, neither of whom testified at trial, concerning the percentage of alcohol in a blood sample taken two hours after the accident. (*Lopez, supra,* 55 Cal.4th at p. 573.) It was undisputed that the statement that the defendant's blood sample contained .09 percent alcohol was admitted for its truth. (*Id.* at p. 583.) The court held the laboratory chart, even with the handwritten notation, was not testimonial in nature. The *Lopez* majority concluded that the notations did not meet the requirements that they be made with formality or solemnity. Neither the nontestifying analyst who performed the analysis nor the laboratory assistant signed, certified, or swore to the contents of the chart. (*Id.* at pp. 584–585.) Justice Werdegar, in a concurring opinion signed by Chief Justice Cantil-Sakauye, Justice Baxter and Justice Chin, agreed that the logsheet notations were not made with sufficient formality or solemnity to be deemed testimonial. (*Id.* at p. 585.)

Here, no evidence that bore on the ultimate facts necessary to establish guilt was presented through a report whose author was unavailable for cross-examination. The only reports received into evidence were prepared by the testifying DNA experts, Grossweiler, Jimenez, and Gustilo, who all testified that they did not include any analysis or conclusions by nontestifying analysts. Their review of subordinates and coworker's notes was limited to ensuring the proper protocols were followed at the laboratory in completing the preparatory steps of the process. Appellant's trial counsel was free to cross-examine these witnesses on DNA issues and did so extensively.

18

In a concurring opinion, Justice Breyer in *Williams* noted "the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another." (*Williams, supra,* 132 S.Ct. at p. 2246.) In *Melendez-Diaz*, the Supreme Court held that not "everyone who laid hands on the evidence must be called" as a witness in order to satisfy the right to confrontation. (*Melendez-Diaz, supra,* 557 U.S. at p. 311, fn. 1.) Based upon existing precedent from the California and United States Supreme Court, we conclude that the data and information relied on by Grossweiler, Jimenez, and Gustilo was not testimonial and appellant's right to confront witnesses against him was not violated by their testimony.

## III.    Substantial Evidence Supports Appellant's Convictions

Appellant contends the evidence was insufficient to sustain the convictions on certain counts. He argues the evidence was insufficient to establish (1) forcible oral copulation in count 1; (2) forcible rape in count 3; and (3) the knife-use enhancement in count 9. We disagree.

When an appellant challenges the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We """"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.""" (*People v. Davis* (1995) 10 Cal.4th 463, 509.) We draw all reasonable inferences in support of the judgment. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) "An inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

### A.    *Count 1–Forcible Oral Copulation*

Appellant rests his sufficiency challenge solely on the ground that Q. M.'s statements, even if true, do not establish that he forced his penis into her mouth.

Appellant overlooks evidence of other conduct we find sufficient to prove oral copulation.

"Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person." (§ 288a, subd. (a).)  The external female genitalia, the vulva, includes "the mons pubis, the labia majora and minora, the clitoris, the vestibule of the vagina and its glands, and the opening of the urethra and of the vagina." (<http://www.drugs.com/dict/vulva.html> [as of June 28, 2013], quoting Stedman's Medical Dictionary.)

Q. M. testified appellant licked her "private area," licked the "pubic hair area" of her vagina and told Jan Hare, a forensics nurse specialist who conducted a sexual assault examination immediately after the attack, that appellant licked her "inner thighs" and "vaginal area."  From the language Q. M. used, the jury could reasonably conclude appellant had oral contact with her and had placed his mouth on her genitalia.  (See, e.g., *People v. Wilson* (1971) 20 Cal.App.3d 507, 510 [evidence of oral copulation was sufficient when victims testified the defendant "kissed them in the vaginal area with his tongue"]; *People v. Hunter* (1958) 158 Cal.App.2d 500, 502, 505 [evidence of oral copulation was sufficient when the defendant "licked and rubbed [the victim] between her legs," and she did a similar act on him]; *People v. Harris* (1951) 108 Cal.App.2d 84, 87–88 [placing one's mouth on a female's "private parts" was oral copulation].)  The evidence here is similar to that found sufficient in the cases cited above, and we therefore conclude the evidence was sufficient to support appellant's conviction of oral copulation.

### B.    Count 3–Forcible Rape

Appellant contends that Q. M.'s statements, even if true, do not establish the essential element of sexual penetration.  We disagree.

The argument appellant advances here was rejected in *People v. Karsai* (1982) 131 Cal.App.3d 224 (disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8).  The crime in that case, as we have here, was rape, which by the terms of section 263 is "complete[d]" by "[a]ny sexual penetration, however slight."  The

defendant argued that he did not commit rape because his penis did not penetrate the victim's vagina. The victim testified that she believed the defendant's penis was inside her body when it was between her labia majora and minora, and at the entrance to her vagina. The court held that "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*Karsai, supra,* at p. 232.) This conclusion was consistent with the "universal rule" in other jurisdictions, and the "clear intent" of the statutory reference to penetration, "however slight." (*Id.* at p. 233.) The court noted that the "penetration which is required is sexual penetration and not vaginal penetration." (*Id.* at p. 232.)

Q. M. testified that appellant succeeded in pressing his penis into the "upper portion" of her vaginal lips. She also testified that appellant's penis went "halfway" but did not go "all the way" inside her vagina. Immediately after the attack Q. M. told Hare that appellant vaginally penetrated her with his penis. This evidence supports the jury's determination that appellant made actual sexual penetration and is sufficient to support his conviction.

### C.      *Count 9–Forcible Rape with Enhancement for Use of Knife*

Appellant contends the knife-use enhancement must be stricken because the victim, Dorothy M., testified that she did not know appellant had a weapon and did not see what cut her arm. The claim is immaterial to the calculation of appellant's sentence because appellant was found to have committed this offense during the commission of a burglary (count 12), and the trial court sentenced appellant on this count to 25 years to life pursuant to section 667.61, subdivisions (a) and (d). In any event, appellant's claim fails because there was sufficient evidence appellant used a deadly or dangerous weapon.[13]

---

[13]      Appellant was not alleged to have used a knife. The second amended information dated March 6, 2012, alleged appellant "personally used a deadly or dangerous weapon in

"The question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt." (*People v. Alvarez* (1996) 14 Cal.4th 155, 225.) The nature and extent of the victim's injuries can support the deadly weapon enhancement. (*Ibid.* [being hit by a blunt instrument, which required suturing with 20 stitches, prevented the victim from opening her mouth and blackened the left side of her face from her hairline to her neck, supported the deadly or dangerous weapon enhancement].)

Dorothy M. testified that she felt appellant "mark" her with some instrument and the injury was "very painful and very hot." She told the 9-1-1 operator that her arm was bleeding and her bed was "full of blood." Toyetta Beukes, conducted a sexual assault examination of Dorothy M. and testified the incised wound on Dorothy M.'s right arm was consistent with a knife or trauma from a weapon because of the fine edges of the wound.

The fact that Dorothy M. could not ascertain the exact nature of the "weapon" used in the assault is of little consequence. It was undisputed that she suffered an incision type wound which bled significantly. The injury alone was sufficient for the jury to draw the inference that appellant used a deadly or dangerous weapon. (*People v. Alvarez, supra*, 14 Cal.4th at p. 225.)

## IV.    Abstract of Judgment

The People correctly point out that appellant's determinate and indeterminate abstracts of judgment reflect erroneous sentences on a number of counts. In light of this court's modification of appellant's sentence to reflect the trial court's intention at the sentencing hearing on April 13, 2012, appellant's determinate and indeterminate abstracts of judgment must be amended accordingly.

---

the commission of the present offense [count 9], in violation of Penal Code section 12022.3."

# DISPOSITION

Upon remittitur issuance, the clerk of the superior court shall prepare amended abstracts of judgment consistent with the modified determinate and indeterminate sentences in part I.C. of this opinion. The clerk shall forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

CHAVEZ

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.